Filed 8/10/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LAURENCE F. NASEY,<br><br>    Plaintiff and Appellant,<br>v.<br><br>FELL HOLDINGS LLC, et al.,<br><br>    Defendants and Respondents. | A174623<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-23-611378) |

For decades, appellant Laurence Nasey owned and operated his businesses out of two properties on Fell and Stanyan streets in San Francisco, but in 2020, he lost title to both properties to respondents at a foreclosure sale. In September of that year, Nasey executed an agreement with certain of the respondents agreeing that he could remain in possession of the properties, pay rent, and would repurchase them in May of 2021 for $10.5 million. The parties executed several addenda to their agreement, extending Nasey's deadline to close escrow, ultimately until September 29, 2022. In December 2023, after Nasey failed to meet that deadline, he brought suit against respondents for declaratory relief. The trial court twice granted respondents' motions for judgment on the pleadings with leave to amend, leading to two more versions of the operative complaint, but in September 2025, the trial court again granted judgment on the pleadings to respondents, this time without leave to amend.

Nasey argues that the subsequent judgment dismissing respondents from the action was in error with respect to each of his four causes of action

1

for declaratory relief because: (1) respondents' failure to provide him with certain disclosures under Civil Code section 1102 was a condition precedent to his performance under the agreement, (2) respondents' failure to make any disclosures regarding the properties under Health and Safety Code section 25359.7 was likewise condition precedent to his performance, (3) he had a right to conduct an environmental assessment of the properties in the summer of 2022 in order to satisfy requirements imposed by his lenders, and (4) respondents prevented his performance by exercising their right to refuse to permit such assessment under the agreement. We affirm.

## BACKGROUND[1]

### The Parties and the Properties

This appeal concerns two parcels of real property: the first located at 1213–1215 Fell Street (the Fell property), and the second at 624 Stanyan Street (the Stanyan property), both in San Francisco (and together, the properties).

Appellant is Laurence Nasey, who owned (through entities that he controlled) and occupied the properties for "decades" prior to May 2020. Nasey's son Nasey Jr. and Nasey's daughter-in-law Denise Borgess lived at the Stanyan property for over 19 years until September 2022.

The Fell property "is a mixed use property. Situated thereon is a building that contains both commercial and residential portions. The commercial portion of the building has been occupied by Nasey and by Fell St. Automotive Clinic doing business as Ted & Al's Towing ('Fell Automotive') for over thirty (30) years. Interior to the building is an improved office area

---

[1] The factual background is drawn from the allegations of the operative second amended complaint.

2

as well as other closed rooms that have been occupied overnight and/or for residential purposes," including by non-party Michael Dianella, who lived there "for over 7 years and was living there at the time of his death in February 2025."

The Stanyan property is likewise "a mixed use property. Situated thereon is a building that contains both commercial and residential portions. The commercial portion of the building was occupied by Nasey and by Stanyan St. Automotive Clinic doing business as Ted & Al's Service ('Stanyan Automotive') for over thirty (30) years. Interior to the building is a residential unit," formerly occupied, as noted, by Nasey Jr. and Borgess "as their home."

The six respondents are Fell Holdings LLC and Stanyan Holdings LLC (together, the sellers); MDF Facility LLC, two of MDF Facility LLC's wholly owned subsidiaries, 1215 Fell SF Owner LLC and 624 Stanyan Owner LLC; and Willow Branch RE Holdings LLC, all Delaware limited liability companies. Non-party Elimelech Tabak is the managing member of Fell Holdings LLC and Stanyan Holdings LLC.

**The Foreclosures and the Agreement**

On March 26, 2020, Nasey lost ownership of the properties through a non-judicial foreclosure sale. And on April 8, trustee's deeds upon sale were recorded transferring title to the Fell and Stanyan properties to Fell Holdings LLC and Stanyan Holdings LLC, respectively.

Following the foreclosures, Nasey negotiated with the new owners of the properties "to repurchase [them] and for each of his businesses, Fell Automotive and Stanyan Automotive, to remain in possession of the [properties], and pay rent pending close of escrow." To that end, Nasey and Tabak (on behalf of the sellers) executed, on a preprinted form, an 18-page

3

agreement dated September 14, 2020 and titled "Commercial Property Purchase Agreement and Joint Escrow Instructions" (the agreement or PSA), and simultaneously, a first addendum to it. Nasey signed the agreement on September 22,[2] agreeing to purchase the properties from sellers for $10,500,000 in cash with a $525,000 initial deposit, and that close of escrow would occur on or before May 31, 2021. Some of the other relevant provisions of the agreement were as follows:

"**3. FINANCE TERMS:** . . . [¶] . . . [¶] **C.** [X] **ALL CASH OFFER**: No loan is needed to purchase the Property. This offer is NOT contingent on Buyer obtaining a loan. . . .

"**15. CONDITION OF PROPERTY**: Unless otherwise agreed in writing: (I) the Property is sold (a) 'AS-IS' in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's Investigation rights; . . . .

"**A.** Seller shall, within the time specified in paragraph 18A, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including known insurance claims within the past five years, and make any and all other disclosures required by law.

"**B.** Buyer has the right to conduct Buyer Investigations of the property and, as specified in paragraph 18B, based upon information discovered in those investigations: (I) cancel this Agreement; or (II) request that Seller make Repairs or take other action."

---

[2] Nasey alleges that the agreement was attached to a "Settlement Agreement and Mutual Release," and that Tabak signed that settlement agreement as " 'Agent' for Fell Holdings but back-dated his signature to September 9, 2020. Tabak did not sign the PSA until April 30, 2021."

"**16.  BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**

"**A.**  Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 18B.  Within the time specified in paragraph 18B(1), Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ('Buyer Investigations'), including, but not limited to, the right to: . . . (vi) satisfy Buyer as to any matter specified in the attached Buyer's Inspection Advisory (C.A.R. Form BIA).[3]  Without Seller's prior written consent, Buyer shall neither make nor cause to made: (I) invasive or destructive Buyer Investigations except for minimally invasive testing required to prepare a Pest Control Report . . . ."

"**18.  TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:  The following time periods may only be extended, altered, modified or changed by mutual written agreement.  Any removal of contingencies or cancellation under this**

---

[3]  The agreement's first attachment was a "Buyer's Inspection Advisory," signed by Nasey on a preprinted form, and warned that "[t]he physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers," and that "**YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO THE FOLLOWING**. . . . [¶] . . . [¶]  **F.  ENVIRONMENTAL HAZARDS:** Potential environment hazards, including, but not limited to, asbestos, lead-based paint other lead contamination, radon, methane, other gasses, fuel oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants)."

**paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).**

"**A. SELLER HAS: 7 (or ~~0~~**[4]**) Days** After Acceptance to Deliver to Buyer all Reports, disclosures and information for which Seller is responsible under paragraphs 5A, 6, 7, 8B(7), 11A, B, C, D and F, 12, 15A and 17A. Buyer after first Delivering to Seller a Notice to Seller to Perform (C.A.R. Form NSP) may cancel this Agreement if Seller has not Delivered the items within the time specified.

"**B. (1) BUYER HAS: 17 (or 0)**[5] **Days** After Acceptance, unless otherwise agreed writing, to: (I) complete all Buyer Investigations; review all disclosures, reports, lease documents to be assumed by Buyer pursuant to paragraph 8B(7) and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property. [¶] . . .

"**(3)** By the end of the time specified in paragraph 18B(1) (or as otherwise specified in this Agreement), Buyer shall Deliver to Seller a removal of the applicable contingency or cancellation (C.A.R. Form CR or CC) of this Agreement. However, if any report, disclosure, or information for which Seller is responsible is not Delivered within the time specified in paragraph 18A, then Buyer has **5 (or ~~0~~**[6]**) Days** After Delivery of any such items, or the time specified in paragraph 18B(1), whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement."

---

4    The preprinted "0" was crossed out, with Nasey and Tabak's initials nearby.

5    Here, the parties did not cross out the preprinted "0."

6    Again, the preprinted "0" was crossed out, with Nasey and Tabak's initials nearby.

6

### The Addenda and Some Earlier Litigation

The first addendum, as noted, was signed by Nasey and Tabak at the same time they signed the agreement (September 22, 2020 and April 30, 2021, respectively). It provided that the following "terms and conditions are hereby incorporated in and made a part of" the agreement: "This Purchase is not subject to any contingencies and is being sold in 'as is, where is' condition, with no seller representations," and "The Seller has never lived or operated in either of the Premises, and purchased the Properties at a foreclosure sale."

At some point in May 2021, the parties executed an "Addendum #2" to the agreement, reducing Nasey's initial deposit to $285,000 and extending his deadline to close escrow until August 31, 2021. Addendum #2 also amended paragraph 11 of the agreement ("Seller Disclosures") by providing: "Seller has no obligation to deliver any documents or make any disclosures under the Purchase Agreement." And it provided that, "If there is any conflict between the terms and provisions of the [agreement] and this Addendum #2, the terms and provisions of this Addendum #2 shall control and prevail."

Nasey did not close escrow by August 31, and on September 8, the parties executed "Addendum #3," extending the deadline for him to do so until December 31, 2021. After that deadline passed, the parties executed "Addendum #4," effective January 13, 2022, again extending the deadline, this time until March 31, 2022.

Like Addendum #2, both Addendum #3 and Addendum #4 provided that their terms would "control and prevail" over conflicting terms of the original agreement. Addenda #2, #3, and #4 made certain portions of Nasey's initial deposit "non-refundable and immediately payable to Seller" in the event that Nasey failed to cancel the contract or vacate the properties by the deadline to close escrow. Both Addenda #3 and #4 contained an

7

acknowledgment by Nasey that "As of the date of this Addendum . . . Buyer acknowledges that Seller has performed all of its obligations and is not in default of any other provisions in the Agreement, and no claims exist against Seller."

"In February and March 2022, disputes arose between the partes regarding the [agreement], a pair of unlawful detainer actions that had been filed by the non-existent entities 'Fell Holdings LLC' and 'Stanyan Holdings LLC' with respect" to the properties, and Nasey's "continuing occupancy" of them.[7]

"On March 28, 2022, a civil action was filed by Nasey, Nasey Jr. and Borgess against the record title holders, Fell Holdings [LLC] and Stanyan Holdings [LLC], for declaratory and injunctive relief regarding their disputes and particularly their rights to purchase the Fell and Stanyan Properties. That civil action was resolved through mediation in May 2022, resulting in a second settlement agreement (the 2022 Settlement Agreement) and a further addendum (the Reinstatement and Addendum #5), which reinstated the [agreement] and set a date of September 29, 2022 for close of escrow on Nasey's purchase of the Subject Properties."

---

[7] The referenced unlawful detainer actions were brought in the name of Stanyan Holdings LLC and Fell Holdings LLC as California limited liability companies, despite the fact that those entities are actually Delaware limited liability companies. They apparently resulted in eviction judgments that Nasey unsuccessfully challenged before the trial court, arguing a lack of fundamental jurisdiction because the purported plaintiffs did not exist. Our colleagues in Division Four reversed and remanded to provide plaintiffs (including some of the respondents here) the opportunity to cure the pleading defects at issue by amendment. (See *1215 Fell SF Owner LLC v. Fell Street Automotive Clinic* (2025) 110 Cal.App.5th 739, 744–750.)

8

**Nasey's Request to Conduct a "Phase II" Assessment**

Meanwhile, "in October 2021 Nasey [had] obtained a Phase I environmental report[8] as required by a prospective financier [*sic*] of his purchase of the Fell and Stanyan Properties. . . . [A]t the time he obtained the Phase I report, Nasey hoped that a Phase I report would be sufficient and that he would not need to obtain any Phase II environmental assessments. However, in the summer of 2022, attorneys for Nasey's prospective financiers [*sic*] conducted a close review of the Phase I report and notified Nasey that the report identified possible contamination within the meaning of CERCLA's 'Recognized Environmental Conditions.' When a Phase I report identifies 'Recognized Environmental Conditions,' obtaining a Phase II assessment becomes a standard part of every prospective lender's diligence to meet the 'appropriate inquiry' element for qualification for the Secured Creditor Safe Harbor Exemption under [the Comprehensive Environmental Response, Compensation, and Liability Act of 1980] CERCLA [(42 U.S.C. § 9601 et seq.] . . . . The reviewing attorneys told Nasey in no uncertain terms that the lenders required a Phase II environmental assessment before they could fund or close escrow."

"As a practical matter, at all times material hereto, Nasey was functionally in a position to conduct whatever investigations and inspections he wanted because he and his businesses were in possession of the Fell and Stanyan Properties. However, the pre-printed boilerplate of paragraph 16.A. of the [agreement] required Seller's prior written consent for 'invasive or

---

8    The complaint does not define a "Phase I environmental report," except as set forth below.

9

destructive Buyer investigations except for minimally invasive testing required to prepare a Pest Control Report.' "

Although "Nasey considered this testing to be only minimally intrusive or destructive,[9] [he] was uncertain as to whether Tabak . . . would" agree. "In an exercise of caution, Nasey told Tabak that he (Nasey) needed to obtain a Phase II environmental assessment, which he said he would conduct quickly and at his own expense so that he could move forward with his financing. Tabak immediately and categorically told Nasey that he could not obtain any Phase II tests, period. Tabak was not willing to discuss the issue, told Nasey that he was 'not going to open that can of worms' and told Nasey he simply could not do the Phase II testing."

Nasey did not close escrow by September 29, 2022.

**The Proceedings Below**

On December 29, 2023, Nasey filed the instant action in San Francisco Superior Court, naming as defendants the respondents here (save Willow Branch RE Holdings, LLC), as well as his son and daughter-in-law.[10] His complaint brought a single cause of action for declaratory relief, with two "counts": the first seeking a judicial declaration that he "was entitled to an appropriate extension of the time to close escrow sufficient to obtain the

---

[9] "Obtaining a Phase II environmental assessment required drilling through the cement flooring to obtain five small core samples of the soil, each core having the diameter of about a 25¢ piece."

[10] Meanwhile, on October 19, 2023, respondent MDF Facility LLC had acquired title to the properties, and then transferred ownership of the Fell property to 1215 Fell SF Owner LLC and the Stanyan property to 624 Stanyan SF Owner LLC. Willow Branch RE Holdings LLC acquired title to the Stanyan property from Stanyan Owner LLC on or about June 21, 2024. On April 9, 2026, Willow Branch RE Holdings LLC filed a joinder in the respondents' brief, but on June 3, withdrew that joinder.

10

Phase II assessment and perform any follow-up reasonably required by Nasey or his lenders"; and the second that "he [was] not in breach" of the agreement and "that his duty to perform was suspended by the refusal of [sellers] to allow a Phase II assessment."

On July 25, 2024, after having unsuccessfully demurred to the complaint, respondents answered it.

For reasons not entirely clear from the record,[11] respondents filed another motion for judgment on the pleadings on September 3, and after briefing and a hearing on October 30, on November 13, the trial court granted the motion with leave to amend.

On December 12, Nasey filed a first amended complaint, and on January 14, 2025, respondents their answer to it.

On February 7, respondents again moved for judgment on the pleadings. After briefing and a hearing held on March 18, on April 7 the trial court granted the motion with leave to amend.

**The Operative Second Amended Complaint**

On April 23, Nasey filed the operative second amended complaint. It alleges four causes of action, each for declaratory relief.

The first cause of action alleges "(A) that . . . Sellers [we]re obligated to comply with all statutory investigation and disclosure requirements, including but not limited to the TDS," elsewhere defined as the "Transfer Disclosure Statement ('TDS')" required by Civil Code[12] section 1102, "for each

---

[11]   The register of actions indicates that on August 21, the trial court ordered the parties to comply with Code of Civil Procedure section 439 "in good faith," and noted that "in the future," a declaration showing such compliance must accompany a motion for judgment on the pleadings.

[12]   Further undesignated statutory references are to the Civil Code.

11

of the Subject Properties, (B) that these statutory TDS [*sic*] have not been, cannot be, waived or contracted away by the PSA, (C) that any time limits on Nasey's inspection and investigation rights do not begin to accrue until Sellers have provided the TDS for each of the Subject Properties, and (D) that compliance with these disclosure requirements is a condition precedent to Nasey's duty to perform and extends the date for his close of escrow."

The second cause of action is substantively identical to the first, except that it replaces "the TDS" with "Health and Safety Code section 25359.7."

The third cause of action asserts that Nasey "was entitled under the PSA to conduct a Phase II environmental assessment as part of his inspection and investigation rights"; that "under the circumstances of Defendant Sellers' refusal to allow the Phase II environmental assessment Nasey was entitled to an appropriate extension of the time, if needed, to close escrow sufficient to obtain the Phase II assessment and perform any follow-up reasonably required"; and that respondents' "refusal to allow the Phase II environmental assessment was a breach that suspended Nasey's duty to perform and to close escrow by September 29, 2022."

The fourth cause of action, however redundantly, seeks a declaration that Nasey is not in breach of the agreement because "Defendants' refusal to allow the Phase II study was a breach of Seller's obligations under the PSA and Seller's breach suspended Plaintiff's duty to perform," and such refusal "actively interfered with and prevented Plaintiff's timely performance because Plaintiff's prospective lenders reasonably requested that Plaintiff provide the Phase II report that would entitle the lenders to the CERCLA safe harbor (as is customary for lenders to require when there is a history of environmental concerns)."

12

On May 23 and 27, respondents filed answers to the second amended complaint. On June 11, they moved a third time for judgment on the pleadings.[13] On July 18, after receiving briefing, the trial court issued a tentative decision granting the motion. A brief hearing was held on July 21, at which the trial court heard argument from counsel and then indicated it would adopt its tentative decision. And on August 28, the trial court granted the motion, this time without leave to amend.[14]

Judgment dismissing respondents from the action was entered on September 5, from which Nasey filed a notice of appeal.[15]

---

[13] That same day, respondents also filed a request for judicial notice of the May 10, 2022 "Settlement Agreement and Mutual Release" referenced in the operative complaint, and out of which the fifth addendum to the agreement arose; and the trial court's prior orders granting judgment on the pleadings. The parties appear to agree that respondents' request was at some point granted, although they do not provide any record citation indicating that this is the case, nor are we able to locate one.

[14] Neither the trial court's tentative decision, its comments at the hearing, nor its final order give any explanation of the basis for its ruling.

[15] In his civil case information statement filed November 12, Nasey's counsel indicated that this appeal is eligible for calendar preference because Nasey "is 83 and has had 7 (minor) surgeries in the past 10 months." And on December 2, respondents filed an motion seeking an expedited briefing schedule and calendar preference, arguing that the parties "have been embroiled in 'summary' type litigation for five years," and alleging that "[d]espite . . . obtaining judgment after three successful dispositive motions," the Fell property "remains in [Nasey]'s possession" and the Stanyan property "sits vacant while this action is pending." Nasey did not oppose the motion to the extent it sought calendar preference, and on January 8, 2026, we granted it.

13

## DISCUSSION

### Judgment on the Pleadings

A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii).) " 'A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review.' (*Kapsimallis v. Allstate Ins. Co.* (2002) 104 Cal.App.4th 667, 672.) 'All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law . . . .' (*Ibid.*) Courts may consider judicially noticeable matters in the motion as well. (*Ibid.*)" (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777; *Environmental Health Advocates, Inc. v. Sream, Inc.* (2022) 83 Cal.App.5th 721, 728–729.) " 'If a judgment on the pleadings is correct on any theory of law applicable to the case, we will affirm it regardless of the considerations used by the superior court to reach its conclusion.' " (*Sream*, p. 729, quoting *Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 185.) Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion. (*Sream*, p. 729.)

### The Law of Declaratory Relief

Code of Civil Procedure section 1060 provides in pertinent part that declaratory relief is proper as to a contract "in cases of actual controversy relating to the legal rights and duties of the respective parties." That said, "[a] trial court may properly sustain a general demurrer to a declaratory relief action without leave to amend when . . . the controversy presented can be determined as a matter of law." (*City of Fresno v. California Highway Com.* (1981) 118 Cal.App.3d 687, 699–700.) And thus have many declaratory relief cases ended by demurrer. (See, e.g., *City of Lancaster v. Netflix, Inc.*

14

(2024) 99 Cal.App.5th 1093, 1114 ["[A] declaratory relief claim is subject to general demurrer where it relates to a substantive claim that is invalid as a matter of law"]; *Childhelp, Inc. v. City of Los Angeles* (2023) 91 Cal.App.5th 224, 236–238, 244 [affirming demurrer without leave to amend where declaratory relief cause of action failed as a matter of law].)

" ' "Strictly speaking, a general demurrer is not an appropriate means of testing the merits of the controversy in a declaratory relief action because plaintiff is entitled to a declaration of his rights even if it be adverse." [Citations.]  However, "where the issue is purely one of law, if the reviewing court agree[s] with the trial court's resolution of the issue it would be an idle act to reverse the judgment . . . [T]he merits of the legal controversy may be considered on an appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend and the opinion of the reviewing court will constitute the declaration of the legal rights and duties of the parties concerning the matter in controversy." ' (*Herzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 24.)" (*Taxpayers for Improving Public Safety v. Schwarzenegger* (2009) 172 Cal.App.4th 749, 769.)

### A Transfer Disclosure Statement Under Section 1102 Was Not A Condition Precedent to Nasey's Performance

*The Transfer Disclosure Law*

Section 1102.3 provides in relevant part that "[t]he seller of any single-family real property subject to this article shall deliver to the prospective buyer" a "completed written statement" making certain disclosures "[i]n the case of a sale, as soon as practicable before transfer of title."  The required disclosures and a form on which they must be made are set out in section

15

1102.6.[16]  Section 1102, subdivision (a) makes the requirement to provide the disclosure statement applicable "to any transfer by sale . . . of any single-family residential property," and section 1102, subdivision (b) adopts a definition of "single-family residential property" from the Business and Professions Code as "real property improved with one to four dwelling units." (§ 1102, subd. (b); Bus. & Prof. Code, § 10018.08.)  Section 1102.2, subsection (k) provides that "[t]his article does not apply to . . . (k) Sales or transfers of any portion of a property not constituting single-family residential property." And section 1102, subdivision (c) further provides that "[a]ny waiver of the requirements of this article is void as against public policy."

*Nasey's Argument*

The operative complaint alleges that respondents never provided Nasey with a disclosure statement pursuant to section 1102 with respect to the properties.  Nasey argues that such disclosure was required because the properties were "improved with one to four dwelling units" (§ 1102, subds. (a) & (b); Bus. & Prof. Code, § 10018.08) and that any purported waiver of the requirement in the agreement or its addenda was void as against public policy (§ 1102.2, subd. (k)).  He then briefly argues that "delivery of the TDS is a nonwaivable condition precedent to [his] performance under the contract," that respondents' failure to provide it "suspended [his] duty to

_____

[16]     These disclosures include whether the property has various features and appliances (dishwasher, oven, garbage disposal, etc.) and whether any (to the seller's knowledge) are not in working condition; any "significant defects/malfunctions" of which the seller is aware in various structural elements of the property (walls, floors, etc.); and whether the seller is aware of any of a list of potential problems with the property, such as environmental hazards, encroachments or easements, unpermitted room additions, zoning violations, and the like.  (§ 1102.6.)

16

perform" under the agreement, "leaves open [his] time to conduct his inspections and investigations," and means he "is not in breach . . . for failing to close escrow or vacate by September 29, 2022."

Even assuming—without deciding—that disclosure under section 1102 was required as to the residential portions of the properties (§ 1102.2, subd. (k)) and that any waiver of such requirement was void as against public policy (§ 1102, subd. (c)), we cannot agree that provision of such disclosure was a condition precedent to Nasey's performance under the agreement.

*The Transfer Disclosure Statement Was Not A Condition Precedent*

"A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed." (§ 1436.) "The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract." (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199 (*Realmuto*); see 13 Williston on Contracts (4th ed. 2026) § 38:16 ["Absent language that clearly indicates an intention either to create a condition or a promise, whether a particular provision is deemed to be a condition as opposed to a promise is to be gleaned from the intent of the parties as determined by considering the contract as a whole"].)

In general, "[t]he rule is that provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction. (*San Diego Construction Co. v. Mannix* (1917) 175 Cal. 548, 556; [citations].) Instead, whenever possible the courts will construe promises in a bilateral contract as mutually dependent and concurrent. [Citations].)" (*Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53–54; *Alpha Beta Food Markets v. Retail Clerks Union Local 770* (1955) 45 Cal.2d 764, 771.) Conditions precedent " 'are not favored by the law," and " 'are to be

17

strictly construed against one seeking to avail [it]self of them.' " (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 594, quoting *Antonelle v. Kennedy & Shaw Lumber Co.* (1903) 140 Cal. 309, 315.)

Here, nothing in the plain language of the agreement suggests that Nasey's obligation to close escrow was "subject to" or "conditioned on" sellers providing him a transfer disclosure report. (See *In re Marriage of Hasso* (1991) 229 Cal.App.3d 1174, 1181 [finding "no basis" for construing a provision as a condition precedent because "the agreement contains no language that it is 'subject to' or 'conditioned on' " a conditional event]; *Berry v. Kettle* (1967) 256 Cal.App.2d 252, 254 [finding no condition precedent where "[n]o conditional language (i.e., 'subject to,' 'if,' etc.) was used"].) Instead, the agreement provides that the close of escrow "*shall* occur on . . . or before May 21, 2021," language that courts routinely construe as mandatory. (Italics added.) (See *In re A.H.* (2025) 115 Cal.App.5th 1217, 1228.)

As noted, the agreement does provide that the seller shall "make any and all other disclosures required by law," and that "Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph [16] and paragraph 18B." Paragraph 18B sets out a timeline for Nasey to review the disclosures and reports for which sellers were responsible, and "Deliver to Seller a removal of the applicable contingency or cancellation." By the agreement's plain terms, it is buyer's approval of the properties' condition that is the contingency, not any delivery by sellers of a transfer disclosure statement.[17] And under

---

[17] Given that Nasey agreed to purchase the properties for cash and the agreement expressly provides it is not contingent on an appraisal, the only other contingency would appear to be, under paragraph 17A, the buyer's

18

paragraph 18 of the agreement, Nasey's remedy in the event such disclosure was not made was cancellation of the agreement, not an indefinite extension of the timeline for him to inspect the properties, approve their condition, and remove the contingency.

In any event, the first addendum provides that the agreement "is not subject to any contingencies," and that the properties were "being sold in 'as is, where is' condition, with no seller representations," terms that must prevail over the boilerplate terms of the preprinted form. (See § 1651 ["parts which are purely original control those which are copied from a form"]; Rest.2d Contracts, § 203(d) ["separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated"]; 11 Williston on Contracts (4th ed. 2026) § 32:13 [observing that added terms " 'represent an express manifestation of the parties' actual intentions and take precedence over any inconsistent provisions in the printed form' "]; Witkin Contracts (11th ed. 2026) § 777(3) [same].)

Add to all this that in May 2021, the parties executed a second addendum, expressly agreeing that sellers "ha[d] no obligation to deliver any documents or make any disclosures under the Purchase Agreement," and that in the event of conflict between that addendum and the original agreement, "the terms and provisions of this Addendum #2 shall control and prevail." And that in September 2021, and again in January 2022—long after any deadline for the sellers to deliver a transfer disclosure statement had come and gone—the parties executed two further addenda affirming that "As of the date of [this addendum], Buyer acknowledges that Seller has

_____

review of a "current preliminary title report" and "any other matters which may affect title."

performed all of its obligations and is not in default of any other provisions in the Agreement, and no claims exist against Seller."

Nasey's argument that the entirety of his performance under the agreement was nevertheless conditioned on sellers' provision of a transfer disclosure statement founders on the plain language of the agreement and its addenda.

If more was needed—and it is not—consider the consequences that flow from Nasey's interpretation of the agreement. To briefly review, Nasey owned, occupied, and operated his businesses from the properties until March 2020, when sellers obtained title to them at a foreclosure sale. The parties then entered into a leaseback agreement, whereby Nasey remained in possession of the properties and agreed to repurchase them by May 31, 2021 for $10.5 million. Over the course of the almost two years that followed, Nasey repeatedly failed to close escrow or vacate the properties despite four extensions of his deadline to do so, leading to two unlawful detainer actions, and presumably, this litigation. And yet under Nasey's view, his deadline to close escrow and duty to perform under the agreement was extended— indeed, *indefinitely*—by the sellers' failure to provide him with the transfer disclosure report required by section 1102.[18] And this despite the fact that the statutorily required disclosures concerned only the residential portions of

---

[18] At the hearing on respondents' motion, Nasey's counsel argued: "What the failure to provide a TDS does is it opens the timeline for Mr. Nasey to complete his investigations. And during that open timeline, Mr. Nasey asked for a phase two." It simply makes no sense that the sellers' failure to make disclosures regarding the *residential* portion of the properties could somehow extend Nasey's originally 17-day timeline to conduct environmental investigations of the *commercial* portions of those same properties well over a year into the future.

20

the properties (whether they featured certain appliances, had defects in the floors or walls, etc.); that he had occupied those same properties for "decades"; and that sellers had purchased them at a foreclosure sale, owned them for less than a year, and "never lived or operated in either" of them.

Quite simply, such result is absurd. And we do not hesitate to conclude—as a matter of law and even taking all of the allegations in the complaint as true—that it could not have been the parties' intent. (See, e.g., *West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1185 [courts " 'should avoid an interpretation which will make the contract unusual, extraordinary, harsh, unjust or inequitable [citations], or which would result in an absurdity . . .' "]; *County of Marin v. Assessment Appeals Board* (1976) 64 Cal.App.3d 319, 325; § 1638.) So, even assuming the parties' waiver of the transfer disclosure requirement may have been void as against public policy, the express terms of the agreement make clear that neither did the parties intend that Nasey's entire performance would hinge on sellers fulfilling such requirement, and Nasey was not entitled to a judicial declaration to the contrary.

*Richman and Realmuto*

In arguing that delivery of a transfer disclosure statement was nevertheless a condition precedent of his performance under the agreement, Nasey primarily relies on two cases: *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1184 (*Richman*) and *Realmuto, supra,* 110 Cal.App.4th 193.)[19] Neither avails him.

---

[19] The third case relied on by Nasey, *Robinson v. Grossman* (1997) 57 Cal.App.4th 634, affirmed a jury verdict in favor of the purchasers of a home based on misrepresentations made by the seller, but in so doing, rejected the purchasers' argument that the sellers' real estate agent had any duty to independently verify or disclaim the accuracy of the seller's representations.

21

In *Richman*, the plaintiff entered into an agreement to purchase defendant's property, "a single parcel improved with two structures: one commercial building and a residential duplex." (*Id.* at p. 1185.) The agreement provided, " 'Seller shall make to Buyer, through escrow, all the applicable disclosures required by law . . . concerning the property,' " and that " 'Sale will be non contingent and property shall be sold in an "AS IS CONDITION" with all [its] faults.' " (*Ibid.*) After the plaintiff failed to close escrow the defendant brought an action for breach of contract, and the trial court granted summary judgment to plaintiff, concluding that the seller could not, as a matter of law, prove that he had performed under the contract because he had never provided the transfer disclosure statement required by section 1102. (*Richman, supra,* 224 Cal.App.4th at pp. 1186–1187.)

*Richman* affirmed, rejecting the seller's argument that such a statement was not required because the transaction was a primarily commercial one, and holding that section 1102 "does not require that the property be used only for residential purposes, but applies to all transfers of real property improved with or consisting of one to four residential units, regardless of whether it also has a commercial use." (*Richman, supra,* 224 Cal.App.4th at p. 1192.) After further concluding that the parties' agreement to an "as-is" sale could not operate as a waiver of the requirements of section 1102, *Richman* went on as follows: "Richman's delivery of a TDS was a statutory condition precedent to Hartley's duty to perform under the

(*Id.* at pp. 642–644.) *Robinson* summarized the provisions of section 1102 as part of a background discussion of the statutory scheme governing a broker's duty to prospective buyers and its history. (See *Robinson, supra,* 57 Cal.App.4th at pp. 641–642.) *Robinson* does nothing to support Nasey's argument here.

Agreement. (*Realmuto v. Gagnard*, *supra*, 110 Cal.App.4th at pp. 201–202.) . . . Because Richman did not perform that condition precedent, Hartley was not required to perform as a matter of law and summary judgment was properly granted." (*Richman*, p. 1192.)

In other words, *Richman*'s conclusion that disclosure under section 1102 was a condition precedent to the parties' agreement relied entirely on *Realmuto*, *supra*, 110 Cal.App.4th 193.

In *Realmuto*, the defendants entered into an agreement to purchase the plaintiff's home for investment purposes. (110 Cal.App.4th at pp. 196–197.) The parties' agreement "required the seller to provide to the buyers certain written disclosures, including a real estate transfer disclosure statement" under section 1102.[20] (*Realmuto*, p. 197.) The seller never provided the disclosure statement, the buyers never completed the purchase, and the seller then sued them for specific performance and breach of contract. (*Id.* at p. 198.) The trial court granted summary judgment to the buyers, concluding that "providing the buyers with a TDS was a condition precedent to the buyers' duty to perform." (*Ibid.*) *Realmuto* affirmed. (*Id.* at p. 205.) After

---

[20]     In particular, "Paragraph 6 of the Agreement required the seller to provide to the buyers certain written disclosures, including a real estate transfer disclosure statement (TDS or disclosure statement). (§ 1102 et seq.) Paragraph 6A stated that the required disclosure statement 'shall be completed and delivered to Buyer, who shall return signed copies to Seller.' Paragraph 6D further provided: 'If the TDS . . . is delivered to Buyer after the offer is signed, Buyer shall have the right to cancel this Agreement within 3 days after delivery in person, or 5 days after delivery by deposit in the mail, by giving written notice of cancellation to Seller or Seller's agent.' Paragraph 16A stated that the seller had five days from the date of acceptance of the Agreement to 'order, request or complete' the required written disclosures and two days 'after receipt (or completion)' to provide them to the buyers." (*Realmuto*, *supra*, 110 Cal.App.4th at p. 197.)

finding that the "statutory requirement [that a disclosure statement be provided] . . . was expressly incorporated into the parties' agreement," *Realmuto* described its "primary task" as "determin[ing] whether the Legislature intended the delivery of a disclosure statement to be a condition precedent to the buyer's performance," and then concluded, based on the statutory language, that such was the Legislature's intent. (*Id*. at pp. 199–202.)

*Realmuto* and *Richman* are distinguishable. In *Realmuto*, the parties' contract expressly required the seller to provide the transfer disclosure statement and included detailed instructions how the seller should do so. (See fn. 20, *ante*.) In *Richman*, the parties' agreement required the seller to make "all the applicable disclosures required by law," and the parties did not dispute the interpretation of that provision, but only whether the transfer disclosure statement was such a disclosure. (*Id*. at pp. 1185–1187.)

The parties' agreement here did the opposite. As discussed, although it contained boilerplate requiring sellers to make "all disclosures required by law," the parties simultaneously executed an addendum providing that the agreement was "not subject to any contingencies," which addendum must prevail over the form itself. After sellers' deadline to make the disclosures had passed, the parties executed additional addenda agreeing that sellers had "no obligation to deliver any documents or make any disclosures under the Purchase Agreement" and "ha[d] performed all of [their] obligations and [are] not in default of any other provisions in the Agreement," and then that those terms should "control and prevail" over the original agreement. In sum and in short, we conclude that sellers' obligation to provide the transfer disclosure statement was not a condition precedent to Nasey's obligations under the contract, and to the extent either *Richman* or *Realmuto* would

24

dictate a contrary result under the circumstances of this case, we decline to follow them.

### Nasey Has Not Alleged That Any Disclosure Was Required Under Former Health and Safety Code Section 25359.7

Until December 31, 2023, former Health and Safety Code section 25359.7, subdivision (a) provided: "Any owner of nonresidential real property who knows, or has reasonable cause to believe, that any release of hazardous substance has come to be located on or beneath that real property shall, prior to the sale . . . of the real property by that owner, give written notice of that condition to the buyer . . . of the real property."

Nasey's opening brief devotes a scant two pages to his second cause of action for declaratory relief based on this statute (together with the third), essentially repackaging his argument with respect to the transfer disclosure law. He argues that the first addendum's "as-is" clause cannot "absolve sellers from liability for failing to disclose known material defects or hazards, including toxic materials, that are not readily observable by the buyer," and that under the "rationale" of *Richman* and *Realmuto*, any waiver of such disclosure requirements is void as against public policy.

But entirely missing from Nasey's opening brief—and more importantly, from the operative complaint—is any suggestion that sellers knew "that any release of hazardous substance ha[d] come to be located on or beneath" the properties, or had reasonable cause to believe that was the case. Indeed, Nasey's brief's discussion of his second and third causes of action do not cite to the record at all, on which basis alone we could treat his argument as waived. (Cal. Rules of Court, rule 8.204(a)(1)(C); Eisenberg, Civil Appeals and Writs (The Rutter Group 2026) ¶ 9:36 ["When an opening brief fails to

25

make appropriate references to the record in connection with points urged on appeal, the appellate court may treat those points as *waived or forfeited*."].)

In any event, it is true in general that "[w]here the seller actively misrepresents the then condition of the property [citations] or fails to disclose the true facts of its condition not within the buyer's reach and affecting the value or desirability of the property, an 'as is' provision is ineffective to relieve the seller of either his 'affirmative' or 'negative' fraud. . . . To enlarge the meaning of such a provision so as to make it operative against all charges of fraud would be to permit the seller to contract against his own fraud contrary to existing law." (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 742, citing § 1668; *Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 304–305.) But fraud must be pled with specificity, and "every element . . . alleged . . . factually and specifically." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47.) Nasey has alleged no misrepresentation—not to mention no scienter, justifiable reliance, or damages—that would create a fraud claim outside the ambit of the agreement's "as-is" provision. (See *Robinson Helicopter Co. Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990 [elements of fraud].) He has thus failed to establish any obligation of the sellers to make any disclosure under former Health and Safety Code section 25359.7, subdivision (a), much less that the failure to fulfill such obligation was a condition precedent to his performance under the agreement. His second cause of action fails.

### Nasey Was Not Entitled to Indefinitely Suspend Close of Escrow to Conduct a "Phase II" Assessment, Nor Was Sellers' Refusal to Permit Such Assessment a Breach of the Agreement

Nasey's third and fourth causes of action, as noted, seek judicial declarations that he was entitled under the agreement to conduct a "Phase II

26

assessment" of the properties, that sellers' refusal to allow him to do so was a breach of the agreement that suspended his obligation to perform under it, and that he is not in breach of the agreement. These causes of action, like the first two, must fail.

To begin with, Nasey never alleges that sellers had any duties or obligations under CERCLA (of disclosure or otherwise), much less that they failed to fulfill them. As discussed, he instead alleges that he "obtained a Phase I environmental report as required by a prospective financier of his purchase of the Fell and Stanyan Properties," that he "hoped that a Phase I report would be sufficient" to satisfy his lenders, but that upon review, his lenders' "attorneys told Nasey in no uncertain terms that [they] required a Phase II environmental assessment before they could fund or close escrow," in order to "qualify for protection under CERCLA's Secured Creditor Safe Harbor Exemption" so that they could avoid liability "for any clean-up costs and also . . . have access to government funding in the event it turned out that remediation or monitoring was required." And he alleges that such requirement by his lenders was both "standard" and "reasonable."[21]

Fair enough, as far as it goes. But what has any of it to do with the sellers? Nasey acknowledges that "financing was not an express Buyer

---

[21]    Nasey also argues that the agreement entitled him to "conduct a Phase II environmental assessment . . . as part of his inspection and investigation rights." But whatever those rights include, under paragraph 16A of the agreement, they exist only "[w]ithin the time specified in paragraph 18B(1)," which paragraph in turn requires that "all Buyer Investigations" be "complete" "17 (or 0) Days After Acceptance." Even if failure to deliver a transfer disclosure statement indefinitely postponed Nasey's time to remove the contingency regarding approval of the property, as he argues, any right to conduct a Phase II assessment as part of his "Buyer Investigations" was long gone by the summer of 2022, when Nasey first sought to conduct one.

contingency under the PSA," but alleges that "throughout their entire course of dealings, the [sellers] knew and understood that Nasey would have to obtain purchase money secured financing in order to close escrow." Indeed, in drafting their agreement, the parties clearly recognized the risks that might arise from Nasey's attempts to secure financing, including that prospective lenders would require lengthy or invasive assessments of the properties that might ultimately not satisfy them or that would upset the agreed-upon timeline to close escrow. By agreeing to an "**ALL CASH OFFER** . . . NOT contingent on [Nasey] obtaining a loan," that Nasey would have (at most) "17 . . . Days After Acceptance . . . to complete all Buyer Investigations," and that sellers' advance written consent would be required for any investigations that were "invasive or destructive," the parties expressly and unambiguously decided that the consequences of those risks would be shouldered by Nasey alone. (See, e.g., *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1419 [observing that a " 'contract is largely an allocation of risks between the parties' "]; see also *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 676–677 [where parties have "contracted with reference (to the frustrating event) or have contemplated the risks arising from it, they may not invoke the doctrine of frustration to escape their obligations" because "to do so would be to evade one of the essential elements of the risk allocation intended by the parties' agreement"].) The fact that those consequences ultimately came to pass does not excuse Nasey's failure to perform under the agreement, and Nasey was not—as a matter of law—entitled to any judicial declaration to the contrary.[22]

---

[22] Nasey's opening brief does not discuss the trial court's denial of leave to amend until its penultimate sentence, which asserts (without explanation or authority) that "if the trial court was inclined to grant judgment on the

**DISPOSITION**

The judgment is affirmed.  Respondents shall recover their costs on appeal.

---

pleadings, it should have also granted Plaintiff leave to amend."  We consider the argument waived.  (See *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 743 [argument "must be supported by both coherent argument and pertinent legal authority" or we "may treat [it] as waived"]; *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 [plaintiff bears the burden of showing a reasonable possibility that a pleading defect can be cured by amendment].)

In addition, Nasey briefly argues that the trial court's consideration of the May 10, 2022 settlement agreement between the parties and its own prior orders granting judgment on the pleadings was "improper," going on to cite boilerplate authorities regarding judicial notice.  (See fn. 13, *ante*.)  As we have not relied on the documents at issue in deciding this appeal, we need not reach this argument.

29

_____

RICHMAN, ACTING P.J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

(A174623P)

30

San Francisco City and County

Trial Judge:       Charles F. Haines, Judge

Counsel:

Draper Law Offices, Ann McFarland Draper for Plaintiff and Appellant.

Seyfarth Shaw, M. Ryan Pinkston for Defendants and Respondents.